# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT K. RICKS,<br><br>        Plaintiff,<br><br>   v.<br><br>O. ONYEJE, et al.,<br><br>        Defendants. | Case No.: 1:15-cv-01148-AWI-BAM (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED<br>(ECF No. 41)<br><br>**FOURTEEN (14) DAY DEADLINE** |

Plaintiff Scott K. Ricks is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. This action is related to *Ricks v. Austria*, 1:15-cv-1147-AWI-BAM, and *Ricks v. Levine, et al.*, 1:15-cv-1150-AWI-BAM.

**I.    Background**

This case proceeds on Plaintiff's complaint against Defendant Dr. O. Onyeje and Defendant S. Navarro for deliberate indifference to Plaintiff's serious medical need in violation of the Eighth Amendment. (ECF No. 1.) As discussed in more detail below, Plaintiff's claim concerns the denial of a request for hernia surgery in late 2014. (*Id.*)

Currently before the Court is Defendant Onyeje's motion for summary judgment under Federal Rule of Civil Procedure 56, filed on November 1, 2017. (ECF No. 41.) On December 4, 2017, Plaintiff filed an opposition to the motion for summary judgment. (ECF No. 42.)

1

On December 11, 2017, Defendant then sought an extension of time to file a reply to Plaintiff's opposition to the motion for summary judgment, (ECF No. 43), which was granted, (ECF No. 44). On January 18, 2018, Defendant timely filed a reply. (ECF No. 47.)

The above motions are deemed submitted, without oral argument. Local Rule 230(l).

## II. Motion for Summary Judgment

### A. Legal Standards

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id*.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id*. (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id*.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not

suffice in this regard. *Id.*; *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### B. Summary of Complaint Allegations

Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at Salinas Valley State Prison. The events at issue occurred while Plaintiff was incarcerated at Pleasant Valley State Prison ("PVSP").

Plaintiff alleges, in pertinent part, as follows: While Plaintiff was housed in a California State Prison, he had two separate, failed, botched hernia surgeries, on May 6, 2010 and April 21, 2011. These surgeries left Plaintiff with three ruptured, ventral hernias. Plaintiff is in severe, unbearable, excruciating pain.

3

On May 29, 2014, Plaintiff was transferred to PVSP. After the transfer, Plaintiff filed various requests to be seen by a doctor for hernia surgery, as well as various appeals.

On June 17, 2014, Plaintiff was seen by J. Fortune, a physician's assistant at PVSP. Plaintiff informed PA Fortune that Plaintiff was in excruciating pain due to three ruptured, ventral hernias, which required urgent surgery. PA Fortune initially refused to examine Plaintiff's hernias, stating "[y]ou are only here today to renew your seizure meds!" After Plaintiff threatened PA Fortune with a lawsuit, he examined Plaintiff's abdomen. Plaintiff "finally convinced PA Fortune to put [him] in, to see the surgeon." Plaintiff put in several more requests to be seen by a physician, as well as several appeals.

On July 10, 2014, Plaintiff was finally allowed to see J. Chokatos, a physician at PVSP. Dr. Chokatos said "[h]ow long have you had those hernias? They look terrible! I am going to recommend you for surgery. You should see the surgeon soon." Plaintiff also filled out a pain assessment. Plaintiff listed his pain as "severe, extreme" and a 7 on a scale of 1 to 10, and a 9 regarding its effect on daily activities.

On July 16, 2014, Plaintiff was seen by a surgeon, Dr. Monfore. Dr. Monfore examined Plaintiff's hernias and declared "[t]hey (CDCR) really fucked you up, didn't they? You need urgent surgery!" That same day, Dr. Monfore wrote "recommendations: major repair required."

On August 4, 2014, Plaintiff filed another appeal requesting hernia surgery. That appeal was lost by the appeals coordinator, Defendant S. Navarro. Plaintiff continued to file prison forms and appeals requesting surgery.

On September 23, 2014, Plaintiff was taken to San Joaquin Community Hospital in Bakersfield, California, to be seen by a gastroenterologist surgeon, Dr. M. Michael. Dr. Michael told Plaintiff "in all my years of medicine, those are the worst hernias that I have ever seen! They (CDCR) should have done surgery on you right away! You need major surgery; we can't even do that here. I will have to send you to USC Medical Center, in LA." Dr. Michael wrote in his order "[n]eeds component separation repair—refer to USC."

On October 2, 2014, Plaintiff was seen, but not examined, by Dr. Chokatos. Dr. Chokatos told Plaintiff "I have the reports from both of the surgeons that you saw. They can't do the

surgery at Bakersfield, so they are sending you to USC. You should have the surgery in a month or two."

Plaintiff continued to seek assistance inside and outside the prison, including from the American Civil Liberties Union and the Office of Internal Affairs. Plaintiff alleges that Defendant Navarro in particular was the health care appeals coordinator, and one of the prison officials who failed to permit the surgery in response to Plaintiff's various prison appeals.

On October 14, 2014, Plaintiff received notification that Defendant Dr. O. Onyeje denied Plaintiff's request for hernia surgery. Defendant Onyeje claimed that Plaintiff was examined by Dr. Chokatos on October 9, 2014, and that surgery could not be performed. According to Plaintiff, that was an "out-right lie and fabrication of records."

On November 2, 2014, Plaintiff received paperwork from the prison law office claiming that Defendant Onyeje had examined Plaintiff and instead of surgery, had written a chrono for an abdominal binder, and then issued an abdominal binder. Plaintiff claims that is another outright lie and fabrication and that Plaintiff had never met, let alone been examined by, Defendant Onyeje. Additionally, Plaintiff claims that he was never issued an abdominal binder. Plaintiff filed various appeals and complaints related to this issue.

On December 26, 2014, Plaintiff was seen by another doctor, M. Conanan. No physical examination took place, although paperwork later claimed that the doctor issued an abdominal binder, which was untrue. Plaintiff also filled out a pain assessment form, in which Plaintiff reported severe, extreme pain. On June 2, 2015, Dr. Conanan examined Plaintiff's hernias.

Plaintiff continued to pursue appeals and complaints inside and outside the prison. Plaintiff was never interviewed by any medical staff, nor examined by any medical staff, as a direct result of his appeals. Plaintiff's "abdomen looks disgusting, it looks like there is a volleyball sticking out on the left side, and two soft balls sticking out on the right side. Meanwhile [he] has been living with unbearable, excruciating pain in [his] abdomen, for the past five years."

Plaintiff also alleges that Defendant Onyeje reviewed the appeals that Plaintiff filed against him, denying every single one.

5

### C. Undisputed Material Facts[1]

Plaintiff is a currently-incarcerated state inmate. (Pl.'s Dep. 8:24-9:16.) Plaintiff has no formal education in the medical or mental health fields. (Pl.'s Dep. 10:5-21.) Plaintiff has never worked in the medical or mental health field. (Pl.'s Dep. 10:22-11:1.)

#### 1. Sierra Conservation Center

Plaintiff was housed at Sierra Conservation Center from February 25, 2009, until he was paroled on February 27, 2012. (Feinberg Decl., ECF No. 41, ¶ 7, Ex B.)

Dr. Forster was Plaintiff's primary care physician at Sierra Conservation Center, beginning around August 28, 2009. (Forster Decl. ¶ 5.) On December 4, 2009, Plaintiff was seen by Dr. Forster concerning a hernia that presented about two years prior. Dr. Forster submitted a referral for a general surgery consult. (First Am. Compl., ECF No. 25, at 4; 12/4/2009 Forster Notes, ECF No. 25, at 56.)

Plaintiff received a CT scan on February 22, 2010, which showed a ventral hernia containing colon, but without obstruction. Dr. Forster referred Plaintiff to Dr. Levine for surgical evaluation. (3/4/2010 Forster Notes, ECF No. 25, at 65; Mark Twain Hospital Reports, No. 49-2, at 35-46; Decl. of Barry Gardiner ("Gardiner Decl."), ECF No. 49-2, ¶ 4(c).)

On May 6, 2010, Plaintiff underwent hernia repair surgery performed by Dr. Levine at Mark Twain St. Joseph's Hospital. (Feinberg Decl. ¶ 9, Ex H; Forster Decl. ¶¶ 6-11.) Prior to the surgery, Dr. Levine discussed with Plaintiff using mesh to repair the hernia, and Dr. Levine had an Ultrapro mesh system available during the procedure. (Levine Decl. ¶ 3.)

Once Dr. Levine examined Plaintiff intraoperatively, Plaintiff was found to have a small epigastric hernia, a small umbilical hernia, and diastasis of rectus sheath. During the procedure, Dr. Levine repaired the ventral hernia and a smaller umbilical hernia. Both hernias were repaired without using mesh, and instead using sutures to close the hernias. (5/14/2010 Forster Notes, ECF No. 25, at 69; Levine Decl. ¶ 3.) Dr. Levine determined that suturing the hernia would be

---

[1] *See* Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment, (ECF No. 41, at 25-32), and Plaintiff's Response to Defendants' Statement of Undisputed Facts In Support of Motion for Summary Judgment and Opposition to Granting Summary Judgment, (ECF No. 42).

6

more appropriate than the use of an Ultrapro mesh system due to Plaintiff's age, as well as the nature and location of the defects. (Levine Decl. ¶ 3.)

On January 18, 2011, Dr. Forster saw Plaintiff for the recurrence of the hernia. (Feinberg Decl. ¶ 10, Ex I; Forster Decl. ¶¶ 12-15.) The supra-umbilical hernia recurred, and Plaintiff was again referred to Dr. Levine by Defendant Forster. Imaging confirmed that the supra-umbilical hernia had recurred. The umbilical hernia did not recur. (Mark Twain Hospital Reports.)

On April 21, 2011, Dr. Levine performed a second surgical hernia repair on Plaintiff. (Feinberg Decl. ¶ 10, Ex J; Forster Decl. ¶ 16; Mark Twain Hospital Records.) During the procedure, Dr. Levine used an underlay technique to place a 20x15 cm piece of surgical mesh which was then sutured into the abdominal wall. The procedure was completed without complication. Plaintiff was discharged from the hospital on April 25, 2011. (Mark Twain Hospital Records.)

Dr. Levine continued to follow Plaintiff after his procedure and through July of 2011, when Dr. Levine discharged Plaintiff in an asymptomatic condition from his clinic back to Dr. Forster. (*Id.*; Levine Decl. ¶ 5.) Specifically, Plaintiff's medical records state that in July 2011, he was discharged as having zero "issues or problems," that his incision was "well-healed" and that there was no recurrence. (7/26/2011 Consultation Notes, ECF No. 60-6, at 15.)

Plaintiff claims that the hernia recurred a second time on or about August 2011. (Pl's Dep. 63:5-9; 63:5-14.)[2]

On August 4, 2011, Plaintiff refused a scheduled follow-up appointment to see Dr. Forster regarding his hernia. Plaintiff wrote on the refusal form, "I just saw Dr. Forster 3 weeks ago. I don't need to see him again. This is an unnecessary appointment. Thank you." (Forster Decl. ¶ 21, Ex. E.)

On August 19, 2011, Plaintiff refused a regularly scheduled appointment to see Dr. Forster. He wrote on his refusal form, as follows:

///

---

[2] The parties dispute whether the hernia in fact recurred at this time, but agree for the purposes of these motions that Plaintiff asserts that the hernia recurred at some point on or about August 2011.

7

> I am refusing the Dr. Forster appointment for 8-19-2011. I did NOT request this appointment; Dr. Forster did NOT request this appointment. I just saw him on 6-6-2011, and I will see him again in September for my chronic care update. Do not re-ducat me until then.

(Forster Decl. ¶ 22, Ex. F.)

On September 22, 2011, Dr. Forster met with Plaintiff for a regularly scheduled appointment regarding his chronic medical conditions. Dr. Forster wrote that Plaintiff did not have any complaints regarding his hernia, and Plaintiff had healed from his hernia surgery earlier in the year. (Forster Decl.¶ 23.)

On October 18, 2011, Plaintiff saw Dr. Forster to request modifications in his chronos; specifically, to have a tall table at visiting due to complaints of chronic back pain. Dr. Forster's notes reflect that Plaintiff had no complaints related to his prior hernia or hernia surgeries. (10/28/2011 Medical Progress Note, ECF No. 49-2, at 64.)

On February 6, 2012, Plaintiff refused to submit to blood tests for scheduled lab tests. On the refusal form regarding this treatment, Plaintiff wrote, "I refuse to give blood on 2-6-2012. I refuse this and any/all future lab ducats. I go home in 3 weeks – thanks anyway." Later, on February 13 and 14, 2012, Plaintiff refused several prescribed medications. (Forster Decl.¶ 24, Ex. H.)

On February 23, 2012, Plaintiff refused to attend his final scheduled appointment with Dr. Forster before being paroled. Plaintiff wrote on the refusal form, "I am being released in 3 days, and I do not need to be seen by Dr. Forster or any other medical staff. I did not request to be seen by Dr. Forster. He can renew my parole meds without me! Thank you." (Forster Decl.¶ 25, Ex. I.)

### 2. Parole and Re-Incarceration at North Kern State Prison

For nearly a year-and-a-half, from February 27, 2012 to June 2013, Plaintiff was out on parole. (Pl.'s Dep. 14:17:1; 71:13-17.) In June 2013, Plaintiff re-offended while on parole and was re-incarcerated. (Pl.'s Dep. 71:13-17.) After Plaintiff was re-incarcerated, he was housed at North Kern State Prison from December 19, 2013, to May 29, 2014. (Feinberg Decl. ¶ 13, Ex B.)

///

Plaintiff had an intake examination at North Kern State Prison on December 23, 2013, conducted by Nurse Practitioner ("NP") Chernekoff. NP Chernekoff noted in the examination report that Plaintiff's hernias had recurred. (Feinberg Decl. ¶ 14, Ex. Q.) NP Chernekoff also noted a lack of abdominal pains/cramps, bowel sounds present in all four quadrants, and therefore that Plaintiff's hernias were not incarcerated, and thus, his hernias were not an acute or emergency condition. (Feinberg Decl. ¶ 14, Ex. Q; Austria Decl. ¶¶ 3, 12.)

While at North Kern State Prison, Plaintiff saw Dr. Austria on January 10, 2014, February 18, 2014, April 1, 2014 and April 29, 2014. (Feinberg Decl. ¶¶ 15-20, Ex. Q; Pl.'s Dep. 72:14-25; Austria Decl. ¶ 2.) On those dates, Dr. Austria saw Plaintiff for treatment of seizures, his lower back condition, and about the renewal of his anti-diarrhea medication. (Feinberg Decl. ¶¶ 15-20; Pl's Dep. 74:10-75:6; 76:1-7; Austria Decl. ¶ 2.)

Specifically, Plaintiff first saw Dr. Austria on January 10, 2014. Dr. Austria noted that Plaintiff's chief complaint was "seizures," and he complained of a seizure a month prior. (1/10/14 Progress Note, ECF No. 43-5, at 52.) Dr. Austria also noted that Plaintiff's anti-seizure medication Dilantin was under the therapeutic standard, and increased Plaintiff's Dilantin, and made a notation which stated, "[v]entral hernia stable, non-tender." (*Id*.)

On February 18, 2014, Plaintiff submitted a Health Care Services Request Form stating that he had a seizure that morning, and it was his third seizure in thirty-five days. (2/18/14 Health Care Services Request Form, *id*. at 54.) Plaintiff also wrote that he wanted to see his primary care physician to increase his seizure medication. (*Id*.) Dr. Austria saw Plaintiff that same day, and again noted that Plaintiff's chief complaint was seizures. (2/18/14 Progress Note, *id*. at 56.) Plaintiff also complained of lower back pain. (*Id*.) Dr. Austria noted that Plaintiff's ventral hernia was "stable." (*Id.*) Dr. Austria ordered x-rays of Plaintiff's lower back, and ordered blood work to check Plaintiff's levels of Dilantin. (*Id*.)

Plaintiff's blood was drawn that same day, and the blood test showed that Plaintiff's Dilantin level was lower than therapeutic levels. (2/18/14 Report, *id*. at 58.) Dr. Austria ordered that Plaintiff's Dilantin prescription be increased, and for Plaintiff's levels to be re-checked in two weeks. (*Id*.)

The next month, a follow-up blood test on March 5, 2014, showed that Plaintiff's Dilantin levels were within proper limits. (3/5/14 Report, *id* at 60.)

Plaintiff's x-rays were done on February 18, 2014, and showed that Plaintiff had mild degenerative changes at L4 and L5. (Lumbar Spine X-ray, *id*. at 62.) Finding that this is not uncommon to see in an obese, forty-seven-year-old man, and was not an acute condition that required urgent treatment, Dr. Austria continued Plaintiff's pain medication for Plaintiff's lower back pain. (Austria Decl., ECF No. 43-4, ¶ 8.)

On April 1, 2014, Dr. Austria saw Plaintiff for an auto-refill for Loperamide, an anti-diarrheal. (4/1/14 Progress Note, ECF No. 43-5, at 64.) Plaintiff claimed that his anti-depression medication, Sertraline (Zoloft) gave him diarrhea. (*Id*.) Lopermide cannot be auto-refilled, and must instead be reviewed by a physician upon each refill, so Dr. Austria found that a Lopermide prescription should be monitored and an auto-refill was not in Plaintiff's best interest. (Austria Decl. ¶ 9.) . Dr. Austria also noted in his progress notes that Plaintiff's "[v]entral hernia [was] stable [and to] continue with activity precaution." (4/1/14 Progress Note.)

Dr. Austria saw Plaintiff for the last time on April 29, 2014, for a medication evaluation. (4/29/14 Progress Note, *id*. at 66.) Plaintiff again requested an auto-refill for Loperamide, which was again denied. (*Id*.) Dr. Austria noted that he told Plaintiff to notify the Licensed Vocational Nurse three days before he runs out, and that Plaintiff agreed with this plan. Dr. Austria also noted that Plaintiff "has no other issues at this time" and "[v]entral hernia stable continue activity precaution." (*Id*.)

### 3. Pleasant Valley State Prison

On May 29, 2014, Plaintiff left North Kern State Prison and was housed at Pleasant Valley State Prison. (Feinberg Decl. ¶ 21; Pl's Dep. 75:7-11.) Defendant Dr. Onyeje was the Chief Medical Officer at Pleasant Valley State Prison. (Feinberg Decl. ¶ 21; Pl.'s Dep. 78:23-79:2.) Typically, the Chief Medical Executive does not personally examine and treat inmate patients, but oversees the inmate's care that other physicians directly provide. (Feinberg Decl. ¶ 21.) Defendant S. Navarro was the Health Care Appeals Coordinator at PVSP.

///

On July 28, 2014, Defendant Onyeje approved Dr. La Sierra's request for a hernia repair surgical consultation. (Feinberg Decl. ¶ 22, Ex. Z.) On September 23, 2014, Dr. Michael (an outside surgeon associated with San Joaquin Community Hospital and Mercy Hospital, Bakersfield) examined Plaintiff. Dr. Michael's report states that Plaintiff had a "13 year Hx of hernia repair recurred," needed component separation repair, and suggested that Plaintiff be sent to USC's tertiary care center. (Feinberg Decl. ¶ 22, Ex. AA.) A tertiary care center involves advanced and complex procedures and treatments, performed by medical specialists in state-of-the-art facilities. (Feinberg Decl. ¶ 22; Pl.'s Dep. 21:1-2.)

On October 28, 2014, Defendant Onyeje spoke to Dr. Michael regarding Plaintiff's hernias. Dr. Michael told Defendant Onyeje that because of the large size of the hernia, the likelihood of incarceration (or strangulation) of the hernia was very low. Dr. Michael warned that surgical repair, or herniorrhaphy, in Plaintiff's case was dangerous: "associated with both high morbidity and high mortality risks." (Feinberg Decl. 24, Ex. CC.) Dr. Michael further agreed that a conservative approach, by use of an abdominal binder, would be the safest treatment at that time, and if surgical repair is required, it should be performed at a tertiary surgical center. (*Id.*)

On October 2, 2014, Dr. Chokatos, a board certified doctor of internal medicine, saw Plaintiff. Dr. Chokatos wrote in his medical progress notes for the visit that Plaintiff's "abdominal wall looked very thin and the organs could be felt right through the skin without any difficulty. There was little abdominal muscle that could be felt." (Feinberg Decl. ¶ 23, Ex. BB.) Dr. Chokatos opined that due to Plaintiff's lack of abdominal muscle, surgery was not likely to succeed, and he recommended conservative treatment, *i.e.*, an abdominal binder and discussed the case with Dr. Onyeje. (Feinberg Decl. ¶ 23, Ex. BB.) Dr. Chokatos' report stated: "The case was discussed with the Chief Medical Officer Onyeje. A general surgeon had seen him locally, but says that closure could not be performed in their facility as the hernias are too large and the anatomy is difficult. For that reason, the patient wants to be referred to a Tertiary Care Center. Unfortunately, the huge hernia would require developed abdominal wall tissue to effect closure. This is not the case; his musculature is essentially atrophic. He has already failed mesh closure. The best option is an abdominal binder." (Feinberg Decl. ¶ 23, Ex. BB.)

On June 3, 2015, Dr. Onyeje again considered surgical hernia repair at the request of Dr. Conanan. Dr. Onyeje referred the issue to the Medical Authorization Review (MAR) Committee. (Feinberg Decl. ¶ 25, Ex. DD.) The MAR Committee consists of representatives from the health care staff of each institution and no less than three staff physicians. (Feinberg Decl. ¶ 25, Ex. DD.) On June 9, 2015, the MAR Committee held that the risk of surgery outweighed the benefits, and recommended conservative treatment. (Feinberg Decl. ¶ 25, Ex. DD.)

Dr. B. Feinberg, Chief Medical Consultant for the California Correctional Health Care Services, reviewed Plaintiff's health history, the complaint, and a transcript of Plaintiff's deposition in this case, and submitted an opinion in this case. (Feinberg Decl. ¶¶ 3-5.) Dr. Feinberg opines that the denial of a third corrective surgery at this time was medically acceptable under the circumstances. (*See id*. at ¶ 6.) The relevant facts include that Dr. Chokatos thought surgery was not likely to succeed based on Plaintiff's medical condition and the failure of the earlier mesh closure, and Dr. Chokatos discussed this opinion with Dr. Onyeje. Dr. Onyeje had also consulted with Dr. Michael, who thought that incarceration or strangulation of Plaintiff's hernia was unlikely, and that surgical repair presented high risks, including of death. (*See id*. at ¶¶ 23-25.) Thus, Dr. Onyeje had approved surgical consultations with outside surgeons, considered their opinions, and based on their consultations and Plaintiff's condition, Dr. Onyeje and the MAR Committee advised against the surgery. According to Dr. Feinberg, such a decision was medically acceptable and within the standard of care. (*See id.* at ¶¶ 25, 30.)

**4.  Salinas Valley State Prison**

On February 1, 2016, Plaintiff was transferred from Pleasant Valley State Prison to Salinas Valley State Prison. (Feinberg Decl. ¶ 26, Ex. B at 1.) While at Salinas Valley State Prison, Plaintiff's case was referred to medical staff at San Joaquin General Hospital and Twin Cities Community Hospital for consultation regarding the possibility of a surgical repair for his recurrent hernia. These hospitals refused to perform the procedure. (Feinberg Decl. ¶ 26; Pl.'s Dep. 18:8-24; 21:9-23:13; 26:3-11; 27:18-28:12.)

Plaintiff had a third hernia corrective surgery on February 27, 2017, at Stanford University Medical Center ("Stanford"). (Feinberg Decl. ¶ 27; Pl.'s Dep. 17: 20-24; 21:1-4.)

Stanford is a tertiary care center and one of the best hospitals in the United States with very high quality medical care. (Feinberg Decl. ¶¶ 22, 26; Pl.'s Dep. 17:24-18:7.)

Dr. Spain, a surgeon at Stanford, first saw Plaintiff on November 1, 2016, and told Plaintiff he would do the surgery. (Feinberg Decl. ¶ 27; Pl.'s Dep. 26:16-25.) Dr. Spain gave Plaintiff the option of not having the surgery at all and simply living with the condition as it was. (Feinberg Decl. ¶ 28; Pl.'s Dep. 30:5-12.) Dr. Spain warned Plaintiff that risks of surgery included bowel injury and other complications. (Feinberg Decl. ¶ 27.) Dr. Spain warned Plaintiff that one of the risks of surgery was death. (Pl's Dep. 37:1-9.) Dr. Spain warned Plaintiff that one of the risks of surgery was recurrence of the hernias. (Feinberg Decl. ¶ 28; Pl's Dep. 38:10-21.) Specifically, Dr. Spain's notes place the risk of complication at 20%, a significant percentage, with a 5% chance of serious complications and a 20% chance of recurrence. (Feinberg Decl. Ex. EE.)

At the time of the third corrective surgery, Plaintiff was forty-nine years old, obese, and in poor physical condition. Plaintiff's age and physical condition greatly increased the risks of surgery and the possibility of a third recurrence. (Feinberg Decl. ¶ 30(b).) Plaintiff's seizure disorder substantially increased the risks of surgery. (Feinberg Decl. ¶ 30(c).)

A few days after surgery, while Plaintiff was still at Stanford, he "coded" in the middle of the night and went into a coma which lasted a week. (Pl.'s Dep. 37:8-14.) The Stanford records indicate that Plaintiff suffered acute postoperative respiratory insufficiency, pleural effusion and acute pulmonary embolism, which is often fatal. (Feinberg Decl. ¶ 29.) Further, while Plaintiff was recovering from surgery at Stanford, he contracted an infection at the surgery site and had a 102.9-degree temperature. (Feinberg Decl. ¶ 29; Pl.'s Dep. 37:18-24.)

**D. Discussion**

Plaintiff asserts in this case that Defendants were deliberately indifferent in violation of the Eighth Amendment by denying him a third hernia surgery. Defendants argue that summary judgment is appropriate because the undisputed facts show that the decision to forgo the third corrective surgery was medically acceptable and within the standard of care.

///

While the Eighth Amendment entitles an inmate to medical care, it is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439 F.3d at 1096); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. *Snow*, 681 F.3d at 985 (citation and quotation marks omitted); *Wilhelm*, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Wilhelm*, 680 F.3d at 1122-23 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citing *Jackson*, 90 F.3d at 332) (internal quotation marks omitted). In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. *Id*. Deliberate indifference may also be found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical treatment." *Hallet v. Morgan*, 296 F.3d 732, 734 (9th Cir. 2002).

///

14

In evaluating whether a medical provider's choice of care was medically acceptable, the inquiry is focused on whether the services are "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Morales Feliciano v. Rossello Gonzalez*, 13 F. Supp. 2d 151, 208 (D. Puerto Rico 1998) (quoting *U.S. v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987)). "The standard does not include the 'most sophisticated that money can buy' . . . but only that which is reasonably appropriate, 'within modern and prudent professional standards' in the field of medicine and health." *Id*. "Society does not expect that prisoners will have unqualified access to health care[.]" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

In this case, Dr. Onyeje approved multiple requests for a hernia repair surgical consultation for Plaintiff. First, Dr. Michael, an outside surgeon, examined Plaintiff, and informed Dr. Onyeje that the risks of surgery outweighed the benefits, and instead a conservative approach, by use of an abdominal binder, would be the safest treatment. Dr. Onyeje also consulted with Dr. Chokatos, who opined that because of Plaintiff's lack of abdominal muscle, surgery was not likely to succeed. Finally, Dr. Onyeje referred the issue to the MAR Committee, and they held that the risk of surgery outweighed the benefits. Dr. Feinberg's opinion is that if any Defendant denied the third surgery, it was not deliberately indifferent under the circumstances, but instead such a determination was medically acceptable and within the standard of care.

Plaintiff does not raise any material dispute of fact regarding this evidence. Plaintiff argues without any support that Dr. Onyeje, as the Chief Medical Officer, was required to examine him because Plaintiff allegedly filed a medical appeal against his primary care physician. Plaintiff appears to argue that the failure to examine him before denying his surgical requests under these circumstances constituted deliberate indifference. Although Plaintiff as an inmate may testify as to his personal experiences in the prison, he is not qualified to provide evidence outside of his personal knowledge on prison procedures or policies regarding the duties of a Chief Medical Officer. *See, e.g.*, *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir.1993) ("When the non-moving party relies on its own affidavits to oppose summary judgment, it

cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."); Fed. R. Civ. P. 56(c)(4) ( "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Plaintiff has presented no competent evidence from which a reasonable trier of fact could determine that Dr. Onyeje violated any policies or regulations here. Nor does the Court find that any such violation would be sufficient to show deliberate indifference to a serious medical need, under the standards explained above.

Plaintiff also contends that on July 28, 2014, he was seen by a surgeon, Dr. T. Monfore, who told Plaintiff that Plaintiff urgently needed surgery. Plaintiff appears to intend to use this statement as evidence that he in fact urgently needed surgery. First, it should be disregarded as inadmissible hearsay. *See Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) ("[O]nly admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."). Second, the statement is a brief exclamation, and it is not clear it would raise more than a difference of opinions between medical professionals about what medical care was appropriate for Plaintiff, which is insufficient to show deliberate indifference.

Nor has Plaintiff shown that Defendants were made aware of Dr. Monfore's alleged hearsay statement, and disregarded it in a way that constitutes a breach of the standard of care, as opposed to a medically acceptable choice between two alternative courses of treatment. In fact, Plaintiff's own notes show that Dr. Spain, the surgeon who eventually operated on Plaintiff, considered the option of doing nothing to be a medical acceptable alternative to having the surgery. Thus, Plaintiff has not raised a genuine issue of fact here based on the alleged hearsay statement by Dr. Monfore.

Plaintiff also argues that there is a genuine issue of material fact because Dr. Chokotas, upon whom Defendants and Dr. Feinberg relied in part, did not actually physically examine him, and instead relied on medical reports. Plaintiff also contends that Dr. Chokotas stated that Plaintiff would have the surgery in a month or two. The latter statement regarding surgery is also inadmissible hearsay which should be disregarded, and is not sufficient to create a genuine issue

of fact for the same reasons discussed above regarding Dr. Monfore's alleged hearsay statements. The undisputed evidence is that, even if Dr. Chokotas' opinion was based on medical reports rather than a direct physical examination, it was a recommendation against surgery that was conveyed to Dr. Onyeje and was set forth in Dr. Chokotas' report. Plaintiff has not shown any genuine dispute of material fact here based on the alleged hearsay statements by Dr. Chokotas.

Plaintiff agrees that Dr. Chokatos and Dr. Onyeje spoke to discuss his case, but also contends that he spoke with Dr. Chokatos about that conversation, and that Dr. Chokatos stated, that Dr. Onyeje stated, that the recommended surgery was costly. Plaintiff appears to assert that this statement shows that any denial by Dr. Onyeje constituted deliberate indifference. As Plaintiff is raising Dr. Onyeje's alleged statement to Dr. Chokatos, which was then conveyed to Plaintiff, as evidence that costs was a reason for Dr. Onyeje's denial, this is arguably double inadmissible hearsay. In any event, it does not raise a genuine issue of material fact here. As noted above, Plaintiff is not entitled to the most sophisticated medical treatment money can buy, nor unqualified access to the medical care of his choice. Under the Eighth Amendment, Plaintiff is only entitled to care that is reasonably appropriate under prudent medical professional standards. Thus, even if Dr. Onyeje made a comment about costs and considered costs in denying Plaintiff's surgical request, so long as the denial was medically acceptable, then the denial does not constitute deliberate indifference.

Plaintiff has not made any showing that the denial was medically <u>un</u>acceptable under the circumstances. Plaintiff attempts to rely on the fact that a third hernia surgery was ultimately performed by Dr. Spain to make this showing. However, it is undisputed that even in 2016, when Plaintiff was referred to outside hospitals for consultation regarding the potential surgery, those hospitals refused to do the procedure. Instead, in Plaintiff's own words, they "referred me to what's called a tertiary care center or a specialty or specialist because they were not experienced enough to perform the extensive surgery that I required." (Pl.'s Dep. 20:13-16.) It is further undisputed that the tertiary care center which performed Plaintiff's surgery involves advanced and complex procedures and treatments, performed by medical specialists in state-of-the-art

facilities. Thus, the option for surgery in this case was limited to highest level of care available in the medical profession. Yet even at that level of expertise and care, Plaintiff's notes show that Dr. Spain advised him that one of his options was to do nothing. Further, the notes state that the likelihood of the risks of complication from the surgery was 20%, with a 5% chance of serious complications and a 20% chance of recurrence. Plaintiff also does not dispute that even with the best care in the country, he indeed suffered complications and nearly died.

Plaintiff gives the unsupported opinion that these medical risks were "fairly minor," (ECF No. 46 at ¶ 56.) This is not sufficient to dispute that this was Dr. Spain's estimate of the risks to him despite being treated at one of the best hospitals in the United States. Further, Defendants have submitted the opinion Dr. Feinberg that these were significant risks, and that they outweighed the benefits of surgery. (Feinberg Decl. ¶ 30. j, k.) At most, Plaintiff may have shown a difference in medical opinions regarding the risks of surgery between these doctors, which is not sufficient to show that Defendants acted with deliberate indifference in denying his third request for surgery. *See Toguchi*, 391 F.3d 1057-58.

In this case, the undisputed evidence shows that the surgical option for Plaintiff's hernia condition was more than what was reasonably appropriate, and therefore any denial by Defendants of Plaintiff's requests for surgery under the circumstances was not deliberate indifference. Therefore, the Court finds that there is insufficient evidence for a reasonable finder of fact to determine that Defendants were deliberately indifferent to a serious medical need in this case, and summary judgment should be granted.

Defendants also assert that the Court should grant summary judgment on the basis of qualified immunity. However, the Court finds that this argument need not be reached, based upon the above determination regarding the undisputed facts in this case.

**III.  Conclusion and Recommendations**

For the reasons explained above, IT IS HEREBY RECOMMENDED that Defendant's Onyeje's motion for summary judgment (ECF No. 41), be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **fourteen**

18

**(14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **March 12, 2018**  /s/ Barbara A. McAuliffe
UNITED STATES MAGISTRATE JUDGE